UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOAN BROWN KEARNEY,<br><br>                                    Plaintiff,<br><br>v.<br><br>FOLEY AND LARDNER LLP,<br>GREGORY V. MOSER, LARRY L.<br>MARSHALL, MICHAEL T. MCCARTY,<br><br>                                    Defendants. | Case No.:  05-CV-2112-AJB-JLB<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANTS'<br>MOTIONS FOR SUMMARY<br>JUDGMENT, (Doc. Nos. 267, 287);**<br><br>**(2) DENYING AS MOOT<br>DEFENDANTS' MOTIONS TO<br>EXCLUDE, (Doc. Nos. 308, 312, 313);<br>AND**<br><br>**(3) DENYING AS MOOT FOLEY<br>DEFENDANTS' ORAL REQUEST<br>FOR LEAVE TO AMEND ANSWERS** |

Presently before the Court are two motions for summary judgment, the first filed by Defendants Foley & Lardner LLP ("F&L"), Gregory V. Moser ("Moser"), and Larry L. Marshall ("Marshall") (collectively, "Foley Defendants"), (Doc. No. 267), the second filed by Defendant Michael T. McCarty ("McCarty"), (Doc. No. 287), (collectively, "Defendants"). The parties fully briefed these matters, and a hearing was held on September 22, 2016. For the reasons set forth below, the Court **GRANTS** Defendants'

1

motions. The Court **DENIES AS MOOT** Defendants' motions to exclude, (Doc. Nos. 308, 312, 313), and Foley Defendants' oral request to amend their answers.

<u>BACKGROUND</u>

Kearney is the former owner of a 52.06-acre parcel of land in Ramona, California ("property") that the Ramona Unified School District ("RUSD" or "District") acquired through eminent domain proceedings for construction of a new elementary school. (Doc. No. 263 ¶ 8.) Defendants were all actors in those proceedings: McCarty was the then business manager and assistant superintendent of the RUSD, F&L was the law firm representing the RUSD, Marshall was trial counsel representing the RUSD, and Moser was F&L's then managing partner and general counsel to the RUSD. (*Id.* ¶ 11; Doc. No. 267-6 ¶¶ 3–5; Doc. No. 267-7 ¶¶ 3–4; Doc. No. 287-2 ¶¶ 1–2.)

## I. *The State Eminent Domain Proceedings*

In the late 1990s, the RUSD approached Kearney, expressing interest in acquiring the property. (*See* Doc. No. 263 ¶ 10.) When the parties were unable to reach an agreement, the RUSD initiated the underlying eminent domain proceedings in June 2000. (*Id.* ¶¶ 10, 12–17.) To determine whether the property was able to support the proposed school, and specifically a septic leach field for the school, percolation testing had to be done. (*See id.* ¶ 25.) In November and December 2000, Kearney's counsel, Moser, and Marshall exchanged many letters, attempting to negotiate access to the property. (*See* Doc. No. 275-13 at 3; Doc. No. 275-14 at 2.) An agreement was not reached before Construction Testing & Engineering Co. ("CTE"), an engineering company hired by the RUSD, accessed the property on December 12, 2000, at which time twelve percolation test holes were drilled. (Doc. No. 287-4 at 71–72, 84–85.) Following that unpermitted entry, Kearney's counsel and Moser agreed that Kearney would consent to the RUSD's access to the property in exchange for "a copy of the report generated . . . and soil percolation study[.]" (Doc. No. 275-9 at 2; Doc. No. 275-10 at 2; Doc. No. 275-12 at 2; Doc. No. 275-13 at 2–3; Doc. No. 275-14 at 2.) The percolation results were important to Kearney because they could support her plans for the property. (*See* Doc. No. 275-1 ¶¶ 11–12.)

Shortly thereafter, on January 14, 2001, the RUSD took lawful possession of the property. (Doc. No. 263 ¶ 23.) CTE accessed the property from January 30 through February 2, 2001, to conduct percolation testing, among other things. (Doc. No. 287-4 at 75.) However, on March 6, 2001, CTE discontinued its work because "[t]he requirements of the project [] changed . . . ." (*Id.* at 136.) Specifically, the RUSD wanted "to pursue connecting [to the] sewer [system] instead of septic." (*Id.*) Whatever percolation test results were obtained, however, were not turned over to Kearney during discovery, (Doc. No. 263 ¶ 27), though there were indications that some percolation testing had occurred. For example, Kearney received an expense itemization document reflecting the RUSD paid CTE nearly $4000 for septic system testing and layout. (Doc. No. 140-1 at 13.) Her trial counsel also took McCarty's deposition in October 2001, during which McCarty was asked whether percolation testing had been performed, to which he responded, "I believe so." (Doc. No. 275-15 at 3, 5.)

The subsequent eminent domain trial lasted from April 29 to May 9, 2002. (Doc. No. 267-3 at 2–3; Doc. No. 267-4 at 3 n.1.) It centered on establishing the best and highest use of the property, which in turn would determine the property's fair value. (Doc. No. 263 ¶ 32.) During closing arguments, Marshall emphasized that the only percolation tests that were conducted were those commissioned by Kearney in 1996 and that the tests did not support her theory that the property could be subdivided into sixteen lots. (Doc. No. 275-16 at 21, 26–27.) Rather, Marshall argued that the property could be divided into only eight lots, and the property's fair value was accordingly $850,000. (*Id.* at 6–7, 31.) Kearney argued that the tests and results in evidence supported her theory that the property could be developed into as many as sixteen lots and that the fair value was therefore appropriately placed at $1.4 million. (Doc. No. 263 ¶ 32.) On May 9, 2002, the jury returned a verdict, specially finding that the property's fair value was $953,000. (Doc. No. 267-3 at 3.) Judge DiFiglia entered judgment on June 13, 2002. (*Id.* at 4.)

Shortly after the presentation of evidence had concluded, a neighbor presented Kearney with a one-page expense itemization document that showed RUSD expended

nearly $17,000 for septic system testing and layout, not the $4000 previously disclosed. (Doc. No. 140-1 at 15; Doc. No. 263 ¶ 37.) This document suggested to Kearney that substantial undisclosed percolation testing had in fact been completed. (Doc. No. 263 ¶ 37; Doc. No. 287-4 at 87.)

On May 21, 2002, Kearney's counsel sent Marshall a request for records under the California Public Records Act ("CPRA"), requesting "all documents relating in any way to the 'septic system and layout' expenditures." (Doc. No. 263 ¶ 38.) Based on this request, Marshall wrote to CTE on May 30, 2002, noting that "[c]opies of [CTE's] engineering evaluation, final reports, septic layouts and the like are not found in the District files." (Doc. No. 267-6 ¶ 11.) Marshall stated he "urgently need[ed] copies of this material in order to appropriately respond to the [CPRA] request." (*Id.*) The following day, CTE sent Marshall a one-page document entitled "Summary of Percolation Testing." (*Id.* ¶ 12.)

Marshall responded to Kearney's CPRA request on June 10, 2002, stating there were no records in the RUSD's possession that were responsive to her request that had not already been disclosed. (*Id.* ¶ 13.) He further stated that any documents in the possession of architects or engineers who were employed by the RUSD would not be provided pursuant to California Government Code section 6254(h).[1] (*Id.*)

Armed with only the one-page expense itemization document, Kearney filed a motion for new trial before Judge DiFiglia on June 28, 2002. (Doc. No. 267-4 at 4–5 & n.2.) A hearing was held on August 9, 2002. (*See* Doc. No. 287-4 at 110.) Judge DiFiglia denied Kearney's motion, finding no evidence to support her assertion of misconduct. (*Id.* at 111–12.) Judge DiFiglia further found nothing in the record to indicate the allegedly

---

[1] "[T]his chapter does not require the disclosure of any of the following records: . . . The contents of real estate appraisals or engineering or feasibility estimates and evaluations made for or by the state or local agency relative to the acquisition of property, or to prospective public supply and construction contracts, until all of the property has been acquired or all of the contract agreement obtained. However, the law of eminent domain shall not be affected by this provision." Cal. Govt. Code § 6254(h).

withheld information's materiality to the outcome of the case. (*Id.* at 112.) The judge noted that "[a]t all times the issue of percolation was not equally available but more available to [Kearney], to present however [she] decided to present it . . . ." (*Id.*) While Marshall brought the one-page CTE summary to the hearing, he did not produce it at that time because Judge DiFiglia did not order him to do so[2]. (Doc. No. 267-6 ¶ 14.)

Kearney filed a notice of appeal of her motion's denial on August 13, 2002. (Doc. No. 263 ¶ 41.) On August 19, 2002, Kearney served a second CPRA request. (Doc. No. 267-6 ¶ 15.) On August 29, Marshall responded by letter, stating the "RUSD would make available materials regarding septic system testing and layout and percolation tests on the Property, that had never been in the possession of the District, but that were obtained by [Marshall] following the trial in response to [] Kearney's [CPRA] request." (*Id.* ¶ 16.) Marshall wrote further on September 24 that the RUSD was waiving its privilege under the California Government Code. (*Id.* ¶ 17.)

CTE faxed to Marshall a three-page document that comprised CTE's summary of the percolation testing. (*Id.* ¶ 18.) On November 1, 2002, Marshall wrote to Kearney's counsel, stating CTE located a document that identified the twenty-four test holes, and that it was available in response to Kearney's CPRA request. (*Id.* ¶ 19.) Marshall faxed the document to Kearney's counsel on November 12, 2002. (Doc. No. 287-4 at 51, 53–55.)

Kearney thereafter filed a motion to aside the judgment on May 16, 2003. (Doc. No. 263 ¶ 47.) Judge DiFiglia denied the motion, citing lack of jurisdiction based on Kearney having already appealed the denial of her new trial motion. (*Id.*) Kearney appealed this decision as well. (*See* Doc. No. 267-4 at 10 n.7.) The California appellate court subsequently affirmed the trial court. (Doc. No. 263 ¶ 48; Doc. No. 267-4 at 15.) The California Supreme Court denied review on May 19, 2004. (Doc. No. 263 ¶ 50.) Kearney also received no relief on her petition for writ of error. (*Id.* ¶ 49; Doc. No. 267-5 at 20.)

---

[2] It is the failure to disclose the CTE percolation results until November 2002 that is the central and only basis for Kearney's claims in her fifth amended complaint.

## II.     The Instant Federal Action

Kearney instituted this action on November 14, 2005. (Doc. No. 1.) On March 28, 2007, Judge Lorenz granted Defendants' motions to dismiss, dismissing the case with prejudice based in part on the *Noerr-Pennington* doctrine immunizing the alleged misconduct. (Doc. Nos. 40, 41.) The Ninth Circuit reversed this aspect of Judge Lorenz's decision in 2009, finding that the allegations of misconduct were sufficient to bring the claims as alleged within the sham exception to the *Noerr-Pennington* doctrine. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643–48 (9th Cir. 2009).

On remand, the case was ultimately reassigned to this Court. (Doc. No. 131.) On March 15, 2012, the Court again granted Defendants' motions to dismiss and dismissed the case with prejudice, this time finding Kearney could not allege a pattern of racketeering activity because she alleged only an "associated-in-fact RICO enterprise involv[ing] a single scheme and injury toward a single victim," and she failed to allege a continuing threat of harm. (Doc. No. 150 at 5–6.) The Ninth Circuit reversed this decision as well. *Kearney v. Foley & Lardner LLP*, 607 F. App'x 757 (9th Cir. 2015).

Kearney subsequently filed the fifth amended complaint, which is the operative complaint in this case, on December 15, 2015. (Doc. No. 263.) Foley Defendants filed their motion for summary judgment on March 25, 2016, (Doc. No. 267), and McCarty filed his motion on July 14, 2016, (Doc. No. 287). The motions were fully briefed, and a hearing was held on September 22, 2016. The Court took the matter under submission at that time.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of establishing the

6

absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23.

If the moving party carries its initial burden, the burden of production shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Id.* at 330. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendants make several arguments to support their position that summary judgment should be entered in their favor.[3] The Court, however, need reach only one: Whether the doctrine of res judicata bars Kearney's federal claims. The Court finds that it does.

### I.    *Law of the Case*

As an initial matter, Kearney argues that the law of the case doctrine bars consideration of Defendants' res judicata argument because entertaining it would contravene the Ninth Circuit's two prior rulings in this case and its decision in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005). (Doc. No. 275 at 9–14; Doc. No. 293 at 18–19.) "Under the law of the case doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d 1380, 1389 (S.D. Cal. 2014) (quoting *United States v. Cuddy*, 147 F.3d

---

[3] Defendants also object to several paragraphs of Kearney's declaration on a variety of grounds. (Doc. Nos. 280-1, 296-3.) As is borne out by this order, the Court has not considered the challenged evidence in ruling of Defendants' motions because the objected to paragraphs are immaterial to the Court's conclusion. The Court will therefore overrule Defendants' objections.

1111, 1114 (9th Cir. 1998)). However, the doctrine "should not be applied woodenly in a way inconsistent with substantial justice." *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987). Accordingly, the Court has the discretion to depart from the law of the case, but only if "(1) [t]he first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would result." *Gallagher*, 14 F. Supp. 3d at 1389 (citing *Cuddy*, 147 F.3d at 1114).

The Court finds that the law of the case doctrine plays no role in the context of the instant motions. With regard to the Ninth Circuit's decision in *Living Designs*, the doctrine precludes the Court only from "reconsidering an issue that has already been decided by the same court, or a higher court in the *identical* case." *Cuddy*, 147 F.3d at 1114 (emphasis added). It should go without saying that *Living Designs* is not this case. The Ninth Circuit's decisions in this case similarly do not bar consideration of Defendants' arguments because neither decision even mentioned res judicata. Whether res judicata applies is, therefore, not an issue that has "already been decided by" the Ninth Circuit. *Id.*

Furthermore, even if the Ninth Circuit's decisions in this case touched on res judicata's applicability, departure from the law of the case is appropriate because "the evidence on remand is substantially different[.]" *Gallagher*, 14 F. Supp. 3d at 1389 (citing *Cuddy*, 147 F.3d at 1114). Specifically, the Ninth Circuit decided issues as they arose on motions to dismiss. *Kearney*, 607 F. Appx. at 758; *Kearney*, 590 F.3d at 641, 646. But the case is now far beyond the pleadings stage. Defendants argue summary judgment is appropriate because the *evidence* shows no genuine issue exists as to res judicata's applicability. Kearney cannot rest on the *allegations* of her complaint to defeat the instant motions, notwithstanding the Ninth Circuit's conclusion that her allegations were sufficient to survive Rule 12(b)(6). The Court therefore finds that the law of the case doctrine does not preclude consideration of Defendants' res judicata argument.

//

//

8

## II.    *Res Judicata*

"Res judicata is one of the oldest and least flexible doctrines in American jurisprudence. It is also one of the most important." *Robert J. v. Leslie M.*, 51 Cal. App. 4th 1642, 1647 (1997). "The consistent application of the traditional principle that final judgments, even erroneous ones, are a bar to further proceedings based on the same cause of action is necessary to the well-ordered functioning of the judicial process." *Slater v. Blackwood*, 15 Cal. 3d 791, 797 (1975) (citations omitted).

The broad doctrine of res judicata is comprised of two related concepts: claim preclusion (res judicata) and issue preclusion (collateral estoppel). *City of Oakland v. Oakland & Fire Ret. Sys.*, 224 Cal. App. 4th 210, 227 (2014). Res judicata "describes the preclusive effect of a final judgment on the merits," *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002), foreclosing "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit," *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). While Defendants assert res judicata and collateral estoppel challenges, the Court considers only the former.

"The Federal Full Faith and Credit statute, 28 U.S.C. § 1738, requires federal courts to 'give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Gonzales v. Cal. Dep't of Corr.*, 739 F.3d 1226, 1230 (9th Cir. 2014) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). The Court will therefore look to the preclusion rules of the State of California in this case. *See Miofsky v. Superior Court*, 703 F.2d 332, 336 (9th Cir. 1983).

California law provides that "[a] valid final judgment on the merits in favor of a defendant serves as a complete bar to further litigation on the same cause of action." *Slater*, 15 Cal. 3d at 795. This doctrine, res judicata, "precludes a party from relitigating (1) the

9

same claim, (2) against the same party, (3) when that claim proceeded to a final judgment on the merits in a prior action." *Adam Bros. Farming, Inc. v. Cnty. of Santa Barbara*, 604 F.3d 1142, 1148–49 (9th Cir. 2010) (citing *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888 (2002)). In addition to these three elements, "[t]he Supreme Court has held that . . . claim . . . preclusion can[not] be applied by a federal court if there was not a full and fair opportunity to litigate in the state proceeding." *Shaw v. St. of Cal. Dept. of Alcoholic Beverage Control*, 788 F.2d 600, 606 (9th Cir. 1986).

Elements (2) and (3) are clearly met in this case: Kearney was the defendant in the eminent domain action, which "proceeded to a final judgment on the merits, a jury verdict." *Adam Bros. Farming, Inc.*, 604 F.3d at 1149; *see also Bernhard v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 19 Cal. 2d 807, 812–13 (1942) (abolishing the privity or mutuality of estoppel requirement).[4] Accordingly, the issues before the Court are whether the instant action is on the same claim and whether Kearney had a full and fair opportunity to litigate in the state proceeding.

## A. Same Cause of Action

In California, "[a] 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Gonzales*, 739 F.3d at 1232–33 (quoting *Crowley v. Kattleman*, 8 Cal. 4th 666, 681 (1994)). The primary right is "the right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based." *Fed'n of Hillside & Canyon Ass'ns v. City of Los Angeles*, 126 Cal. App. 4th 1180, 1202 (2004). If two lawsuits are based on the same primary right, then the same claim is implicated. *Id.*

_____

[4] Under the doctrine of mutuality, "neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326–27 (1979). To the extent Kearney does dispute the application of res judicata based on the identity of Defendants, (*see* Doc. No. 275 at 14; Doc. No. 293 at 20), that contention is not well taken in light of *Bernhard*.

10

The scope of the doctrine "depends on how the injury is defined." *Ewing v. Superior Court*, 90 F. Supp. 3d 1067, 1076 (S.D. Cal. 2015). It "is defined in part by reference to the set of facts, or transaction, from which the injury arose." *Fed'n of Hillside & Canyon Ass'ns*, 126 Cal. App. 4th at 1203. The determinative factor, however, "is the harm suffered. When two actions involving the same parties seek compensation for the same harm, they generally involve the same primary right." *Gonzales*, 739 F.3d at 1233 (quoting *Boeken v. Philip Morris, Inc.*, 48 Cal. 4th 788, 798 (2010)). "If the same primary right is involved in two actions, judgment in the first bars consideration not only of all matters actually raised in the first suit but also all matters which *could have been raised*." *Id.* (quoting *Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1174 (1983)) (emphasis in original).

Defendants contend that Kearney seeks to vindicate the same primary right in this action that was at issue in the eminent domain proceeding: her right to be justly compensated for the RUSD's taking of the property. (Doc. No. 267-1 at 23; Doc. No. 287-1 at 23.) Kearney argues the primary right doctrine is inapplicable because she did not split her claims between two lawsuits. (Doc. No. 275 at 17.) She further contends the § 1983 claim did not exist until she exhausted her state court remedies, and she did not know of the facts giving rise to the RICO claims until after the eminent domain trial. (*Id.* at 17–18.) She also argues she is not relitigating claims for wrongful taking and denial of just compensation. (Doc. No. 275 at 14; Doc. No. 293 at 20.) She further argues that her prayer for emotional distress damages defeats Defendants' motions. (Doc. No. 275 at 9; Doc. No. 293 at 15; *see* Doc. Nos. 275-5, 293-5.) Finally, Kearney argues that Defendants' conduct amounts to extrinsic fraud. (Doc. No. 275 at 18–20; Doc. No. 293 at 24–25.)

### 1.    Applicability of the Primary Rights Doctrine

Kearney's contention that the primary right doctrine is inapplicable is meritless. It is indisputable that "California courts employ the 'primary rights' theory to determine what constitutes the same cause of action for claim preclusion purposes." *Brodheim v. Cry*, 584

F.3d 1262, 1268 (9th Cir. 2009). This approach stands in contrast to the federal "transactional" theory of claim preclusion.[5] *Id.*

Kearney's allegations make clear that she again seeks to vindicate her right to be compensated fairly for the RUSD's taking of the property, regardless of the claims she brings or types of relief she seeks. In her civil RICO claims, Kearney alleges that the purported racketeering activity's "common purpose was to defraud [her] and prevent her from receiving the fair value of her Property."[6] (Doc. No. 263 ¶ 58.) She also alleges that Foley Defendants "made decisions throughout [the eminent domain] process that were designed to achieve, and did achieve, the associated-in-fact enterprise's goal of fraudulently minimizing the amount [the] RUSD would have to pay [Kearney] for her Property." (*Id.* ¶ 61.) She alleges "F&L knew about the common scheme to defraud [her] of the true value of her Property . . . ." (*Id.* ¶ 68.) Kearney further alleges that because of this conduct, she "did not receive fair value for her Property in an amount to be proven at trial, including, at a minimum, the difference between the actual value of the Property and the approximately $950,000 awarded by the jury . . . ." (*Id.* ¶¶ 64, 69.)

Kearney makes similar allegations in her § 1983 claim, alleging that McCarty, Moser, and Marshall "engaged in a concerted course of conduct and scheme calculated to deny [her] of her civil rights" under the Fifth Amendment to receive just compensation for the property's taking. (*Id.* ¶¶ 74–75, 77.) Kearney again alleges she "did not receive fair value for her Property" and seeks, "at a minimum, the difference between the actual value of the Property and the approximately $950,000 awarded by the jury . . . ." (*Id.* ¶ 77.)

---

[5] The transactional theory "focuses on the transactional nucleus of operative facts and includes all rights to remedies with respect to all or any part of the 'transaction,' determined pragmatically, out of which the action arose, so long as they could conveniently be tried together." *In re George*, 318 B.R. 729, 735 (9th Cir. 2004).

[6] Once again, the alleged mechanism whereby Defendants sought to defraud Kearney was withholding the CTE percolation results until November 2002.

It simply cannot be disputed that Kearney "seek[s] compensation for the same harm[.]" *Gonzales*, 739 F.3d at 1233 (quoting *Boeken*, 48 Cal. 4th at 798). The alleged wrong by Defendants is their purported efforts to ensure Kearney was not justly compensated for the property. The actions in the eminent domain proceedings and this case concern the same property, the same taking by the RUSD, the same eminent domain proceedings, and even the same valuation expert opining the same valuation figure. (Doc. No. 282-3 at 2–5; Doc. No. 282-4 at 5–6; Doc. No. 294-2 at 3.) The Court therefore finds Kearney's present RICO and § 1983 claims are "based on the same underlying factual circumstances as the claims [she litigated] in state court. The particularities of [her] causes of action are irrelevant." *Adam Bros. Farming, Inc.*, 604 F.3d at 1149.[7]

## 2.   Extrinsic Versus Intrinsic Fraud

Kearney next contends that Defendants' conduct amounts to extrinsic fraud. Her position is clearly wrong under established California case law:

> Fraud by a party will not undermine the conclusiveness of a judgment unless the fraud was extrinsic, i.e., it deprived the opposing party of the opportunity to appear and present his case. ***The suppression of evidence is intrinsic fraud***. Therefore, a judgment does not lose its res judicata effect because it was entered while evidence was being suppressed.

*Eichman*, 147 Cal. App. 3d at 1175–76 (emphasis added) (citations and internal quotation marks omitted); *see Cedars-Sinai Med. Ctr. v. Superior Court*, 18 Cal. 4th 1, 10 (1998) (same). Stated simply, "[c]oncealment by a party of evidence which, if disclosed, would tend to overthrow his case, is not extrinsic fraud and therefore is not ground for a suit to set aside a judgment." *Pietro v. Pietro*, 147 Cal. App. 2d 788, 791 (1957).

Defendants' alleged fraud concerns suppression of evidence in the underlying, fully litigated eminent domain proceeding. The fraud at issue in this case is therefore intrinsic, and such allegations do not undermine the conclusiveness of the state court action. *See*

---

[7] For similar analyses, see *Rodriguez v. Bank of N.Y. Mellon*, No. 13-CV-1830-GPC-BLM, 2014 WL 229274, at *6 (S.D. Cal. Jan. 17, 2014), and *Thomas v. Bank of Am., N.A.*, No. 12-CV-2475-GPC (WMC), 2013 WL 3992999, at *6 (S.D. Cal. Aug. 5, 2013).

*Kachig v. Boothe*, 22 Cal. App. 3d 626, 633 (1971) ("we think it is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony" (quoting *Pico v. Cohn*, 91 Cal. 129, 133–34 (1891))).

Kearney argues that this rule, first articulated in *Pico*, 91 Cal. at 133–34, has no bearing on this case because she "is not seeking to set aside or vacate the prior judgment of eminent domain." (Doc. No. 275 at 19–20; Doc. No. 293 at 24–25.) However, that she is not technically seeking to collaterally attack the eminent domain judgment does not preclude res judicata's application. *See Rios v. Allstate Ins. Co.*, 68 Cal. App. 3d 811, 818 (1977) ("Technically plaintiff's bad faith cause of action may not be a collateral attack upon the arbitration award . . . . But it is [] clear that plaintiff's bad faith cause of action arises out of Allstate's alleged subversion of the arbitration proceeding and that if he should prevail on this new cause of action, he would be compensated for damages sustained by reason of Allstate's alleged oppressive conduct [during the arbitral proceedings]. The course pursued by plaintiff thus collides with the policy underlying the doctrine of finality of judgments.").[8]

In sum, the Court finds that the rule first enunciated by the California Supreme Court long ago in *Pico* remains the law in California, and that Kearney's allegations make clear Defendants' purported misconduct at issue in this case is intrinsic, not extrinsic, fraud.

### 3.    Kearney's Knowledge and Date of Occurrence

Kearney next argues res judicata does not apply because she did not know of the facts giving rise to the RICO claims until after the eminent domain trial, and her § 1983 claim did not exist until the California Supreme Court denied review in May 2004. Res judicata only "precludes recovery on claims arising prior to [the first judgment's] entry,

---

[8] Kearney also insinuates that *Pico* is no longer controlling law because it was decided before the concept of mutuality was abolished in *Bernhard v. Bank of America*, 19 Cal. 2d 807 (1942). (Doc. No. 275 at 18–19; Doc. No. 293 at 24.) The Court disagrees with this contention in light of the California courts' continued reliance on *Pico. See, e.g.*, *Cedars-Sinai Med. Ctr.*, 18 Cal. 4th at 10–11; *Kachig*, 22 Cal. App. 3d at 632–33.

[but] it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955). "Under California law, . . . a judgment is not final for purposes of res judicata during the pendency of and until the resolution of an appeal." *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 928 (9th Cir. 2006) (quoting *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir. 1985)). Accordingly, in this case, any cause of action that arises from conduct that occurred prior to May 19, 2004—the date the California Supreme Court denied review—constitutes the "same cause of action" as that already litigated in the eminent domain proceedings. *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923, 928 (9th Cir. 2000) ("[T]he Hotel claims that this suit should not be barred by res judicata because many of the alleged predicate acts charged in the RICO complaint occurred after the filing of its state court actions. However, the doctrine of res judicata bars the relitigation of all events which occurred prior to entry of judgment, and not just those acts that happened before the complaint was filed").

The Court finds that the date Kearney learned of the acts giving rise to her RICO claims does not affect res judicata's application. As just discussed, fraud intrinsic to an underlying litigation has no impact on that judgment's res judicata effect. Relatedly, California courts place the burden on litigants to unearth intrinsic fraud during the course of litigation. *See Cedars-Sinai Med. Ctr.*, 18 Cal. 4th at 9 ("[T]he law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation . . . . For our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings." (quoting *Silberg v. Anderson*, 50 Cal. 3d 205, 214 (1990))). As such, any fraud Kearney knew or should have known about during the eminent domain proceedings cannot be relitigated now. *See, e.g.*, *Kougasian v. TMSL, Inc.*, 208 F. App'x 561, 563 (9th Cir. 2006) ("A comparison of the amended complaints in Kougasian II and Kougasian IV reveal that Appellants knew or

should have known about the alleged fraud and should have properly raised that claim in Kougasian II.").[9]

It cannot reasonably be disputed that Kearney's RICO claims are predicated on conduct that occurred before, during, and in the months following the eminent domain litigation and trial, but before May 2004. The conduct she cites as predicate acts for her claims occurred between April 2000 and November 2002 and center on what Defendants failed to disclose to her and the state trial court. (*See* Doc. No. 263 at 16–26.) Because all predicate acts occurred prior to May 2004, res judicata bars their relitigation.

The Court finds similarly unavailing Kearney's contention that res judicata does not apply to her § 1983 claim because it did not accrue until after the California Supreme Court denied review. "It is not until a party seeks and is denied just compensation from the state that a constitutional violation occurs." *Adam Bros. Farming, Inc.*, 604 F.3d at 1147. Here, the Ninth Circuit has held that "it was only when the California Supreme Court finally

_____

[9] While neither side addressed this issue, the Court must acknowledge California case law that recognizes a "newly discovered facts" exception to res judicata. *See, e.g.*, *Allied Fire Protection v. Diede Constr., Inc.*, 127 Cal. App. 4th 150 (2005). This exception permits subsequent litigation of claims that do not arise until after the complaint in the initial litigation is filed, judged by when the plaintiff learns of the facts underlying her claims. *Id.* at 155–56. In other words, if by the defendant's fraud a plaintiff is unaware of the facts giving rise to her claims prior to filing the initial complaint, the unknown claims are not barred by res judicata, even if the events occurred prior to the initial complaint's filing. *Id.* at 155–57. While, at first glance, this exception appears useful to Kearney, "[n]owhere in the [*Allied*] case does the court mention the primary rights theory. Although not stated explicitly, it appears the court applied federal rather than California preclusion law." *In re Andrews*, 2014 WL 2547808, at *11 (9th Cir. June 5, 2014). Here, the Court is bound to apply California's res judicata law as the underlying litigation was a state court action, and California law is contrary to the *Allied* decision.

But even if the Court applied the *Allied* rule to the facts of this case, the outcome would be the same. The exception applies only when, by the defendant's fraud, the plaintiff is unaware of the facts giving rise to her claim. Yet, as explained *infra*, there were several indications that should have put Kearney on notice, prior to trial, that percolation test results may have been undisclosed. *See infra* Discussion Section II.B.

declined Kearney's request for review in May 2004 that the state failed to provide just compensation and Kearney's claim accrued." *Kearney*, 607 F. Appx. at 758.

However, like her RICO claims, Kearney's § 1983 claim is predicated solely on Defendants' conduct during the eminent domain proceedings. This situation is indistinguishable from that presented in *Adam Bros. Farming, Inc.*:

> Adam Bros. argues that its present temporary takings claim cannot be the same claim for purposes of res judicata because this claim could not have been brought and did not exist until after the California court invalidated the county's false wetland designation. Yet its present claim is still based on the same underlying factual circumstances as the claims it raised in state court. The particularities of Adam Bros.'s causes of action are irrelevant.

604 F.3d at 1149 (footnote omitted). The Ninth Circuit readily found res judicata barred Adam Bros.'s takings claim. *Id.* Kearney's § 1983 claim is likewise barred.

### 4.    Types of Claims and Prayer for Damages

Kearney's final contentions—that she is not relitigating claims for wrongful taking and denial of just compensation, and that her prayer for emotional distress damages defeats Defendants' motions—are similarly unavailing. "Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief." *Mycogen Corp.*, 28 Cal. 4th at 897 (citation omitted). As discussed above, it is evident that Kearney seeks to relitigate her right to receive just compensation for the property's taking. There need not be a complete identity between claims for a prior litigation to preclude subsequent litigation so long as both actions involve the same primary right and thus the same claim. *Mfd. Home Cmtys. v. City of San Jose*, 420 F.3d 1022, 1032 (9th Cir. 2005) ("Different theories of recovery are not separate primary rights.").

Similarly, that Kearney now seeks the additional relief of emotional distress damages does not foreclose res judicata's application. This conclusion is consistent with the California appellate court's decision in *Kachig v. Boothe*, 22 Cal. App. 3d 626 (1971). There, the defendants in the second action (plaintiffs in the first) had obtained judgment in

their favor against the plaintiffs in the second action (defendants in the first) in the first action based in part on a letter. *Id.* at 630. Following judgment in the first action, the plaintiffs determined the defendants had falsified that letter and instituted the second action, alleging claims arising from that falsification, including intentional infliction of emotional distress. *Id.* at 630–31. The trial court granted the defendants' motion for judgment on the pleadings. *Id.* at 629.

The appellate court affirmed. *Id.* at 642. The appellate court's decision rested largely on the fact that the plaintiffs sought to reopen litigation based on fraud intrinsic to the first action. *Id.* at 632–34. The appellate court further explained that a claim of intentional infliction of emotional distress could not lie because "the recognition of [this claim] on the facts of this case would largely subvert the notion that false evidence must be discovered and exposed in the first trial to avoid multiplicity of litigation[.]" *Id.* at 640–41 (footnote omitted). This was so because "[i]n almost every case in which the prior judgment was procured by the adverse party through perjured testimony or a false document, severe emotional distress would be a substantially certain result." *Id.* at 640 n.1; *see also Boeken*, 48 Cal. 4th at 798 ("[t]he cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought").

The rationale espoused in *Kachig* applies with equal force here. Kearney seeks, as an element of damages, the emotional distress she has suffered as a result of the eminent domain proceedings. However, allowing this aspect of her damages claim to defeat Defendants' argument "would largely subvert the notion that false evidence must be discovered and exposed in the first trial to avoid multiplicity of litigation[.]" *Kachig*, 22 Cal. App. 3d at 640–41. This the Court cannot do.[10]

_____

[10] Furthermore, at the hearing on these motions, Kearney's counsel admitted that the onset of her emotional distress occurred in November 2002, which predates the California Supreme Court's denial of her petition for review. As discussed above, res judicata bars claims that are predicated on events occurring prior to entry of judgment in the first case. *See supra* Discussion Section II.A.3.

In sum, the Court finds this case involves the same cause of action as the eminent domain proceedings. The Court will therefore turn to the second issue: Whether Kearney had a full and fair opportunity to litigate in the state court.

### B.    Full and Fair Opportunity to Litigate

Kearney argues that Defendants' concerted actions denied her "a full and fair opportunity to present her case as to the value of her land [by] knowingly conceal[ing] material evidence." (Doc. No. 275 at 14–16; Doc. No. 293 at 20–21.) As noted above, "claim . . . preclusion can[not] be applied by a federal court if there was not a full and fair opportunity to litigate in the state proceeding." *Shaw*, 788 F.2d at 606. "[I]n the context of claim preclusion, a party has had a full and fair opportunity to litigate if the procedures provided meet the requirements of the Due Process Clause of the Fourteenth Amendment." *Id.* The Court "must bear in mind that no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 (1982). "'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 (1974) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). At minimum, however, the fundamental requirements of procedural due process are notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Kearney cannot seriously contend that she was deprived of notice or an opportunity to be heard. Her participation in a multi-day trial and appellate review proceedings belie such a position. *See, e.g.*, *Kremer*, 456 U.S. at 483–85 (stating the Court had "little doubt [plaintiff] received all the process that was constitutionally required" in the underlying action where state law provided, *inter alia*, an opportunity to present, albeit informally, his charges on the record, including exhibits and witness testimony, as well as an opportunity to rebut the opposing party's evidence and judicial review); *W. Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1525 (9th Cir. 1990 (easily finding plaintiff had a full and fair opportunity to litigate in the state eminent domain proceeding because "[i]t had a jury trial,

and then petitioned for review to both the Oregon Court of Appeals and the Oregon Supreme Court"). The Court is directed to no circumstances indicating that the California state court was not competent to address Kearney's instant claims or that the procedures employed during the proceedings were somehow deficient. *See, e.g.*, *Monterey Plaza Hotel Ltd. P'ship*, 215 F.3d at 928 (finding res judicata barred subsequent federal RICO claims because "they were capable of being litigated and decided in the state court").

Kearney's argument is predicated on Defendants' conduct. Yet, in neither of her oppositions nor at oral argument did Kearney cite to any authority for the proposition that a litigant's alleged suppression of evidence robs a state court proceeding, which includes a jury trial and subsequent appellate review, of its procedural due process characteristics.[11] *See Ewing*, 90 F. Supp. 3d at 1076 ("Plaintiff argues he was not given an opportunity to fully litigate his commerce clause claim in state court because his attorney refused to make the claim upon his request. However, there is no suggestion the procedures provided to him failed to meet the requirements of due process.")

Furthermore, in the context of this case, it is unlikely Kearney can make such an assertion. If Defendants wrongfully withheld the percolation tests during the discovery process, the Court notes Kearney did not take advantage of many of the discovery tools afforded to her despite many indications prior to trial that percolation tests had, in fact, occurred. For example, Kearney consented to the RUSD accessing the property in late 2000 in exchange for copies of any percolation test results and reports. (Doc. No. 275-13 at 3; Doc. No. 275-14 at 2.) She also received an expense itemization document reflecting the RUSD paid CTE nearly $4000 for septic system testing and layout. (Doc. No. 140-1 at 13.) Furthermore, Kearney's trial counsel took McCarty's deposition prior to the eminent domain trial, during which McCarty was asked whether percolation testing had been performed, to which he responded, "I believe so." (Doc. No. 275-15 at 3, 5.)

---

[11] The cases Kearney does cite merely parrot the uncontroversial proposition that a litigant must be afforded a full and fair opportunity to litigate her claims.

Notwithstanding these suggestions that percolation testing had in fact occurred, Kearney did not utilize any of the tools afforded to her by the discovery process. She did not, for example, serve any supplemental discovery requests, subpoena documents from or take a deposition of CTE, or undertake her own additional percolation tests. (Doc. No. 287-4 at 127–29.) *See Mercury Casualty Co. v. Superior Court*, 179 Cal. App. 3d 1027, 1033 (1986) ("depositions, interrogatories, requests for inspection and production of documents, and requests for admissions are discovery tools" (citations omitted)). No significant follow-up questions were asked of McCarty at his deposition with regard to percolation testing. (*See* Doc. No. 275-15 at 5–6.) That Kearney had these tools at her disposal, even if she chose not to use them, is all that procedural due process requires. *See Kremer*, 456 U.S. at 485 ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy."); *see also Bailey v. Anderson*, 326 U.S. 203, 205 (1945) ("[I]t has long been settled that due process does not require the condemnation of land to be in advance of its occupation by the condemning authority, provided only that the owner have opportunity, in the course of the condemnation proceedings, to be heard and to offer evidence as to the value of the land taken. Its value may be fixed by viewers without a hearing, after entry upon the land, if their award is subject to a review in which a trial upon evidence may be had. Here, appellant was given full opportunity to be heard and to introduce evidence before the Commissioners. . . . [W]e find no denial of due process[.]" (citations omitted)); *City of Oakland v. United States*, 124 F.2d 959, 964 (9th Cir. 1942) ("[D]ue process require[s] no more than that the owner be given an opportunity to be heard at some stage of the proceedings upon reasonable notice of the pending suit.").

Even if she had undertaken any of these steps, it is hard to say what difference having the percolation test results would have made in the eminent domain proceeding. Kearney's valuation expert, Robert James, all but admitted that percolation testing did not matter to his opinion placing the property's value at $1.4 million:

Q: Okay. Did you look at any perc tests in connection with your physical possibility opinion?

A: No. . . .

Q: Have you ever looked at any perc tests related to this property?

A: No. . . .

Q: Are you aware of any perc tests that were done on each lot, each of the 16 proposed lots, as of the date of valuation, that confirm that 16 individual septic systems was physically possible?

A: I wasn't even aware there was a perc test done on the property as a whole. . . .

Q: Okay. But let's assume, again, that the perc tests were needed, one for each lot of the 16 lots. Okay? And that those perc tests had not been even done at the time of valuation. Are you saying that your opinion would not change, that septic was physically possible?

A: ***No, and it doesn't have to, because we are able to make these assumptions with the provisio that we can change our opinion if it turns out that's not true***.

(Doc. No. 294-2 at 8–10 (emphasis added).) From James's testimony, it appears Judge DiFiglia's observation that Kearney's counsel made a tactical decision to not introduce more percolation test results at trial was well-founded. (Doc. No. 287-4 at 111.) The Court is disinclined to now, nearly fifteen years later, second guess those trial court proceedings.

In sum, the Court finds that Kearney seeks to relitigate before the Court the same claim that was at issue in the eminent domain proceedings. During those proceedings, Kearney had a full and fair opportunity to litigate that claim. As such, the doctrine of res judicata applies to bar all of Kearney's claims in the instant action. The Court therefore **GRANTS** Defendants' motions for summary judgment in their entirety.

## II.    *Motions to Exclude and Requests for Leave to Amend Answers*

The Court also has before it Defendants' motions to exclude, (Doc. Nos. 308, 312, 313), and Foley Defendants' oral request for leave to amend their answers made at the

hearing on the summary judgment motions. Because their motions for summary judgment have been granted, the Court **DENIES AS MOOT** Defendants' pending requests.[12]

CONCLUSION

The Court is sympathetic to Ms. Kearney for the grief she feels these events and litigation have caused her. However, the doctrine of res judicata "should not be impaired for the benefit of particular plaintiffs, regardless of the sympathy their plight might arouse in an individual case." *Slater*, 15 Cal. 3d at 797. Furthermore, the law is clear: Kearney may not litigate claims predicated on the suppression of evidence during an underlying proceeding.

> [W]e think it is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony. The reason of this rule is, that there must be an end of litigation; and when parties have once submitted a matter . . . for investigation and determination, and when they have exhausted every means for reviewing such determination in the same proceeding, it must be regarded as final and conclusive . . . . [W]hen [the aggrieved party] has a trial, he must be prepared to meet and expose perjury then and there. . . . The trial is his opportunity for making the truth appear. If, unfortunately, he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy.

*Cedars-Sinai Med. Ctr.*, 18 Cal. 4th at 10–11 (quoting *Pico*, 91 Cal. at 133–34). While the Court does not condone Defendant Marshall's failure to disclose the percolation report at the time of the hearing on the motion for new trial or before, as Judge DiFiglia ruled, Ms. Kearney had the opportunity to bring to light the percolation tests during discovery in the eminent domain proceedings. She had reason to believe tests were done, as stated herein,

---

[12] The Court would like to note, for Defendants' edification, that their motions to exclude are untimely. Pursuant to the scheduling order regulating discovery and other pre-trial proceedings, motions to exclude were due no later than August 10, 2016. (Doc. No. 245 ¶ 6.) While the jury trial preparation and scheduling order permitted motions in limine to be filed no later than November 3, 2016, the order explicitly excluded *Daubert* motions from its definition of "motions in limine." (Doc. No. 247 ¶¶ 2–3.)

05-CV-2112-AJB-JLB

but failed to pursue those in the normal course of litigation. She had her day in court when that case went to trial in 2002. The Court cannot now be "transform[ed] into an appellate tribunal for [those] state proceedings." *Adam Bros. Farming, Inc.*, 604 F.3d at 1150. For the reasons stated herein, the Court **GRANTS** Defendants' motions for summary judgment, finding the doctrine of res judicata bars the entirety of this action. (Doc. Nos. 267, 287.) The Court **DENIES AS MOOT** Defendants' motions to exclude, (Doc. Nos. 308, 312, 313), and Foley Defendants' oral request to amend their answers.

**IT IS SO ORDERED.**

Dated:  September 28, 2016

Hon. Anthony J. Battaglia
United States District Judge